# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| JACQUELINE BARNEY, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 21-00459-CV-W-BP |
| CAPITAL VACATIONS, LLC. | ) ) | |
| Defendant. | ) | |

## ORDER (1) GRANTING MOTION TO COMPEL ARBITRATION AND (2) DIRECTING PARTIES TO FILE STATUS REPORTS

Plaintiff initiated this suit in federal court, asserting a single claim (on behalf of herself and a putative class) alleging that Defendant violated the Telephone Consumer Protection Act, ("the TCPA").  Defendant filed a Motion to Compel Arbitration, which prompted Plaintiff to file an Amended Complaint, (Doc. 12), also asserting a single claim under the TCPA on behalf of Plaintiff and a putative class.  Defendant filed an Amended Moton to Compel Arbitration, (Doc. 17), which is now **GRANTED**.

## I.  BACKGROUND

In the Amended Complaint, Plaintiff alleges Acquis LLC – a Nevada LLC with a principal place of business in Florida who is not a party to this suit – operates a website referred to as "the DreamTrip Website."  (Doc. 12, ¶ 12.)  The DreamTrip Website operates a sweepstakes offering individuals an opportunity to enter a drawing to win a $5,000 Gift Card, and the Amended Complaint provides a screenshot of the sweepstakes entry form.  (Doc. 12, ¶ 14.)  Below the entrant's name and contact information is a box ("the Box") that is checked when it is clicked.  Immediately next to the Box is a paragraph that states in relevant part that

"[b]y clicking this box and the Submit Entry button," the entrant "agree[s] to the Privacy Policy and Terms & Conditions that are hyperlinked at the bottom of the page." The paragraph next to the Box also contains language regarding the entrant's receipt of texts, emails, or calls from other entities; details about these terms relate to the merits of the TCPA claim and not to the issues currently before the Court. However, for present purposes it is notable that it discloses that the entrant will or may receive communications from a variety of companies, including Defendant.

Below the Box (and two other boxes that are not relevant to the issues before the court) is a large, blue, hyperlinked field with the words "SUBMIT ENTRY." The parties agree that the "SUBMIT ENTRY" field cannot be activated and an entry cannot be submitted on the computerized form unless the Box is checked. (*E.g.*, Doc. 28, p. 6 (citing Doc. 18-1, p. 2, ¶ 6).)[1] Moreover, Plaintiff does not deny checking the Box.

At the bottom of the page, below the blue hyperlinked field with the words "SUBMIT ENTRY," are three separate hyperlinks entitled "Privacy Policy," "Terms & Conditions," and "Official Rules." The hyperlink for Official Rules is underlined; the other two hyperlinks are not underlined. The hyperlink labeled "Terms & Conditions" leads to a page entitled "Terms & Conditions." (Doc. 18-1, pp. 19-26.) In the first paragraph the reader is advised to read the Terms & Conditions "BEFORE ACCCESSING, USING, OR SIGNING UP FOR AN OFFER OR PROMOTION ON" a series of websites, including "www.dreamtripusa.net" and defines all such websites as the "DREAM TRIPS$^{TM}$ WEBSITES." (Doc. 18-1, p. 19.) This is significant because Plaintiff alleges that she entered her information on www.dreamtripusa.net/0327/grpwowcrg/. (Doc. 12, ¶ 12.)

---

[1] All page numbers for documents filed with the Court are those generated by the Court's CM/ECF system.

2

The second paragraph of the Terms & Conditions advises that "THIS AGREEMENT CONTAINS ARBITRATON AND CLASS ACTION WAIVER PROVISIONS" and specifies that those provisions appear in "SECTION 10 BELOW WHICH ALSO DESCRIBES YOUR RIGHT TO OPT OUT."  (Doc. 18-1, p. 19.)  For present purposes, the relevant portion of section 10 states as follows:

> YOU AND WE AGREE TO RESOLVE ALL DISPUTES AND CLAIMS BETWEEN US IN INDIVIDUAL, BINDING AND CONFIDENTIAL ARBITRATION THAT INCLUDES, BUT IS NOT LIMITED TO, ANY CLAIMS ARISING OUT OF OR RELATING TO . . . (iv) ANY TELEMARKETING OR OTHER CALL OR MESSAGE (INCLUDING BUT NOT LIMITED TO SMS MESSAGES) YOU CLAIM TO HAVE RECEIVED FROM US **OR ONE OF OUR PARTNERS** . . . .

(Doc. 18-1, p. 23 (emphasis supplied).)

Acquis is not mentioned anywhere on the website.  It is also not mentioned in the Terms & Conditions.  When identifying the parties to the agreement, the third paragraph of the Terms & Conditions states: "The Website and other DREAM TRIPS™ WEBSITES are owned and operated by DreamTrips, LLC, a Nevada corporation ('we', 'us' or 'our' as appropriate)." However, there is no corporation or LLC named "DreamTrips LLC.  "Dream Trips" and "DreamTrips LLC" are trade names that have been used by Acquis for several years (although it is not clear whether they have always been registered as such).  (Doc. 18-1, pp. 1-2, ¶ 4; Doc. 31-1, pp. 2-3, ¶ 7; *see also* Doc. 12, ¶ 12 (Plaintiff's allegation that Acquis operated the website using these names).)  Acquis registered "Dream Trips" as a fictitious name in Nevada in 2019. (Doc. 31-1, p. 22.)  In November 2021 (after this suit was filed) it registered "Dream Trips" and "Dream Trips LLC" as fictitious names in Florida and "DreamTrips LLC" in Nevada.  (Doc. 31-1, pp. 32, 34, 36.)

3

Plaintiff does not dispute the basic facts sets forth in Part I above. Plaintiff further alleges that Defendant obtained her telephone number from Acquis, (Doc. 12, ¶ 12), and later used a prerecorded voice message to contact Plaintiff and offer to sell her a vacation package, (Doc. 12, ¶¶ 21-22, 24-25, 27-28), thus giving rise to Plaintiff's TCPA claim. Defendant argues that Plaintiff agreed to arbitrate the claim. Plaintiff contends that (1) she did not enter a contract to arbitrate disputes and (2) even if she did, Defendant is not a party to that agreement. The Court resolves these issues below.[2]

## II. DISCUSSION

### A. Existence of a Contract[3]

The parties agree that it is the Court's role to determine if Plaintiff entered an agreement containing an arbitration clause. The Court concludes that she did.

Plaintiff contends that there was no contract because she did not assent. "Internet contracts, just like other agreements, require mutual assent between the parties – a so-called 'meeting of the minds.'" *Foster v. Walmart, Inc.*, 15 F.4th 860, 863 (8th Cir. 2021). "Broadly speaking, there are two ways for a website operator to invite acceptance, with numerous variations in between." *Id*. (quotation omitted). The first, referred to as a "clickwrap" agreement, "requires the user to explicitly assent by clicking 'I agree' (or something similar)

---

[2] Defendant argues that the arbitration provision is not unconscionable. (*E.g.*, Doc. 18, pp. 20-21; Doc. 25, pp. 5-9.) But Plaintiff is arguing that an agreement to arbitrate was not formed and is not arguing that the agreement to arbitrate is unconscionable, so there is no need to discuss this issue further.

[3] It is not clear which state's law governs the issues related to contract formation. The Terms & Conditions provide that they are to be interpreted under Florida law, but that does not establish that Florida law governs the formation of the contract. The parties have variously cited Florida and Missouri law. The Court deems it unnecessary to resolve the issue because the principal issue of assent is a basic issue of contract law, and there is no suggestion of a substantial difference between those two states' laws on any of the issues the Court must resolve.

4

before using the website or purchasing a product" in which case assent is established "because the user sees the list of the terms and conditions before accepting them." *Id*. The second method, referred to as a "browsewrap" agreement, "imputes assent through the user's performance of some specific act" such as using the website, and the "users are never asked if they agree to the terms and conditions." *Id*. at 864.

The Court does not believe it necessary to pigeonhole the website in this case as involving either a clickwrap or browsewrap agreement, particularly as the Eighth Circuit acknowledged that there is a continuum between the two. To the extent that it matters, the Court views the agreement at issue as much closer to a clickwrap than a browsewrap agreement. An entrant had to take an affirmative step to click on the Box specifically indicating agreement with the Terms & Conditions. It is true that the Terms & Conditions were not on the website but instead were accessible by a hyperlink and thus incorporated by reference; however, the entrant expressed awareness of, and agreement to, the Terms & Conditions by checking the Box. Critically (and contrary to Plaintiff's characterization (*see* Doc. 21, p. 15)), mere use of the website did not indicate assent; Plaintiff's separate affirmative act expressly indicating assent was required. In summary: the website advised Plaintiff that she agreed to the Terms & Conditions "[b]y clicking [the B]ox and the Submit Entry button . . . ." That same notice advised Plaintiff that the Terms & Conditions were "hyperlinked at the bottom of" the page, which was true. By checking the Box and clicking the Submit Entry button, Plaintiff assented to the Terms & Conditions.

Plaintiff presents several additional arguments opposing this conclusion, but the Court finds them unpersuasive. Her first series of arguments relate to the appearance of the webpage;

she emphasizes that the language next to the Box is in smaller type, the hyperlink with the Terms & Conditions is at the bottom of the page below the "Submit Entry" field, and the hyperlink is not underlined. (*See* Doc. 21, p. 15.) These facts are true, but they do not alter the Court's legal conclusions. There are clearly words next to the Box, and those words clearly advise that the Terms & Conditions are at the bottom of the page and checking the Box indicates the entrant's agreement to the Terms & Conditions. A person may choose to check the Box without reading the words or without reading the Terms & Conditions, but the words advise the entrant where to find the Terms & Conditions if knowing them is important to the entrant. The words next to the Box also clearly advise the entrant of the legal significance of checking the Box. Those words also accurately describe the location of the hyperlink that leads to the Terms & Conditions, and that location is not so far away from the Box that the legal analysis is affected. Similarly, the fact that the hyperlinked words "Terms & Conditions" are not also underlined is of no legal importance.[4]

Plaintiff next draws comparisons to other cases involving cases on the clickwrap/browsewrap continuum, but the facts in those cases are different. *Foster* involved a browsewrap agreement because purchasers of Walmart's giftcards were not asked to explicitly indicate their assent; instead, purchasers of giftcards were advised that they assented to the terms and conditions (including the arbitration provision) simply by using Walmart's website. "None of the 29 plaintiffs were ever asked to agree to the terms and conditions on Walmart's website, so like most browsewrap cases, the key here is the adequacy of the notice" that using the website

---

[4] Plaintiff also argues that the colors employed makes portions of the webpage unreadable. (*E.g.*, Doc. 12, ¶ 14; Doc. 21, p. 8.) The Court has viewed the page as replicated by Plaintiff in the Amended Complaint (which she describes as proving this point) and disagrees with Plaintiff's characterization.

6

indicated the purchaser's assent. *Foster*, 15 F.4th at 863. Similarly, in *Fridman v. 1-800 Contacts, Inc.*, 2021 WL 3603348 (S.D. Fla. Aug. 13, 2021), the defendant's website stated that individuals agreed to the arbitration provisions "[b]y using, registering with or shopping at" the website. *Fridman*, 2021 WL 3603348, at *3. The customer was not required to take an affirmative act specifically signifying assent. And in *Anand v. Heath*, 2019 WL 2716213 (N.D. Ill. June 28, 2019), the website contained the words "I understand and agree to the Terms & Conditions which includes mandatory arbitration and Privacy Policy" above a big blue box with the word "Continue" inside. *Anand*, 2019 WL 2716213, at *1. However, based on Illinois law (which is not governing in this case), the notice was insufficient absent the use of a separate "I Accept" button similar to the Box that was used in this case. *Id*. at *3. In contrast to all these cases, Plaintiff was asked to check the Box if she wanted to submit an entry and was advised of the legal consequences of checking the Box – and she checked the box. Thus, unlike the plaintiffs in the cases cited, Plaintiff was required to take a separate and specific affirmative act that clearly signified her agreement to the Terms & Conditions.

Finally, Plaintiff attaches legal significance to the fact that Acquis is not identified as a party and that the Terms & Conditions purport to make "DreamTrips LLC" a party. She reasons that because there is no entity called DreamTrips LLC, there was no party with whom she could contract so no contract was formed. The Court disagrees. A party (such as Acquis) may enter a contract using its fictitious name, even if that fictitious name is not registered; the failure to register the name does not affect the validity of a contract using it. *E.g., Lewandowski v. Alabama Housing Fin. Auth.*, 2021 WL 4432601, at *6 (Mo. Ct. App. Sep. 28, 2021); *Phillips v. Hoke Const., Inc.*, 834 S.W.2d 785, 788 (Mo. Ct. App. 1992); *Coca-Cola Bottling Co. v.*

7

*Groeper*, 691 S.W.2d 395, 397 (Mo. Ct. App. 1985); *see also Worm World, Inc. v. Ironwood Productions, Inc.*, 917 So.2d 274, 275 (Fla. Dist. Ct. App. 2005) (citing Florida and Missouri law). Moreover, it is permissible to append "LLC" to the end of a fictitious name, and contrary to Plaintiff's argument doing so does not transform the fictitious name into something else. *E.g., Phillips*, 834 S.W.2d at 788 n.3; FLA. STAT. § 865(14); NEV. REV. STAT. § 602.017(2).[5] Thus, by adding "LLC" to the end of the (registered or unregistered) fictitious name "DreamTrips" did not mean that the contracting party was a non-existent LLC named "DreamTrips LLC."[6]

For these reasons, the Court concludes that Plaintiff assented to, and entered, an agreement to arbitrate disputes arising from her receipt of messages and calls from Acquis's partners.

### B. Enforceability by Defendant

Plaintiff's second argument is that even if the arbitration agreement is valid, Defendant cannot enforce it because Defendant is not a party to the agreement. The Court disagrees for two reasons. First, the arbitration agreement delegates questions of arbitrability to the arbitrator, (*see*

---

[5] The Court has cited authority from Florida, Missouri, and Nevada because it is not clear which state's law governs this issue. Florida and Nevada have an additional requirement: a business may register a fictitious name that includes the designation "LLC" only if the business is an LLC. That requirement is satisfied because Acquis is an LLC.

[6] This conclusion is not altered by the cases Plaintiff cites. For instance, in *Rhodes Eng'g Co. v. Public Water Supply Dist. No. 1*, 128 S.W.3d 550 (Mo. Ct. App. 2004), one party to a contract purported to be a water district formed under Missouri law. However, the water district did not exist as a legal entity, so the contract was a nullity. In contrasts Acquis exists (and existed at the time of the contract) and as explained above Acquis's use of DreamTrips LLC as a trade name does not mean Plaintiff contracted with a nonexistent entity. In *Jay Wolfe Used Cars of Blue Springs, LLC v. Jackson,* 428 S.W.3d 683 (Mo. Ct. App. 2014), a husband and wife purchased a car and executed a contract for the sale and a separate loan agreement. The contract for sale identified "Jay Wolfe" as the seller; "Jay Wolfe" was a fictitious name for Saturn of Kansas City Inc. The loan agreement was with "Jay Wolfe Auto Outlet," which was a fictitious name for Jay Wolfe LLC. The contract for sale included an arbitration provision; the loan agreement did not. In a suit involving the loan agreement, the Missouri Court of Appeals held that the arbitration agreement from the contract did not apply to the loan agreement because "Jay Wolfe" referred to Saturn of Kansas City Inc. and not Jay Wolfe LLC, so Jay Wolfe LLC did not enter an agreement to arbitrate. 428 S.W.3d at 688-89. In contrast, there is no real doubt that "DreamTrips" is a trade name used by Acquis.

Doc. 18-1, p. 24 (third paragraph)), and "[w]hether a particular arbitration provision may be used to compel arbitration between a signatory and a nonsignatory is a threshold question of arbitrability." *Eckert/Wordell Architects, Inc. v. FJM Properties of Willmar, LLC*, 756 F.3d 1098, 1100 (8th Cir. 2014). Second, even if this is an issue for the Court to decide, the Court would find that Defendant can enforce the arbitration provision because it is a third-party beneficiary of the arbitration provision. As discussed earlier, the agreement provides for arbitration of

> CLAIMS ARISING OUT OF OR RELATING TO . . . (iv) ANY TELEMARKETING OR OTHER CALL OR MESSAGE (INCLUDING BUT NOT LIMITED TO SMS MESSAGES) YOU CLAIM TO HAVE RECEIVED FROM US OR ONE OF OUR PARTNERS . . . .

(Doc. 18-1, p. 23.) There is no dispute that Defendant is one of Acquis's partners; moreover, Defendant is specifically referenced on the sweepstakes entry as an entity that might contact an entrant and thereby give rise to a claim "arising out of or relating to [a] a telemarketing or other call or message" described in the arbitration agreement. Given that (1) a claim against a "partner" is to be arbitrated and (2) Acquis would not necessarily be a party to any suit against its partner based on the partner's sending of a call or message, the clear intent of the provision was to permit the partner (i.e., Defendant in this case) to enforce the arbitration provision. *See Torres v. Simpatico, Inc.*, 781 F.3d 963, 971 (8th Cir. 2015) ("[T]he language of the Agreement is sufficiently broad and inclusive to express an intent to benefit not only the actual signatories and named beneficiaries, but also the other Non–Signatory Parties . . . ."); *Nitro Distributing, Inc. v. Dunn*, 194 S.W.3d 339, 345 (Mo. 2006) (en banc) ("To be bound as a third-party beneficiary, the terms of the contract must clearly express intent to benefit that party or an identifiable class of which the party is a member.").

9

## III. CONCLUSION

For the reasons stated above, the Amended Motion to Compel Arbitration, (Doc. 17), is **GRANTED**. The case shall remain stayed pending completion of the arbitration. The parties shall file a Joint Status Report upon the earlier of (1) the commencement of the arbitration or (2) ninety days form the date of this Order, outlining the status of the arbitration. Additional Joint Status Reports shall be filed every ninety days thereafter.

**IT IS SO ORDERED.**

/s/ Beth Phillips
BETH PHILLIPS, CHIEF JUDGE
Date: December 13, 2021                    UNITED STATES DISTRICT COURT

10